**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| ABDULLAH MCLAUGHLIN | : | No. 17-121-2 |

## MEMORANDUM

PRATTER, J.                                                      FEBRUARY  16 , 2021

Abdullah McLaughlin seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).

The bases for his motions are the prevalence of COVID-19 throughout the facility where he is

currently incarcerated and that he has recovered from a bout of the virus. The Government opposes

the motion, given that Mr. McLaughlin does not present an extraordinary and compelling reason

to justify his release and given the danger he presents to the community. For the following reasons,

the Court denies the motion.

### BACKGROUND

### I.      Mr. McLaughlin's Criminal Conduct

Mr. McLaughlin was charged in a three-count indictment with conspiracy to commit

robbery which interferes with interstate commerce (Hobbs Act robbery), in violation of 18 U.S.C.

§ 1951(a), attempted Hobbs Act robbery, also in violation of 18 U.S.C. § 1951(a), and using and

carrying a firearm during and in relation to the conspiracy and attempted Hobbs Act robbery, in

violation of 18 U.S.C. § 924(c). The charges arose out of a planned attempt with three others to

rob a neighbor's apartment for drugs and money in September 2016.

Mr. McLaughlin and his co-conspirators accosted their victims outside the apartment.

They first pistol-whipped one before forcing both victims at gunpoint into the victims' apartment.

All members of the conspiracy were armed. Their activity outside was recorded on surveillance

1

video. Once inside the apartment, the conspirators used cable wire to tie up their victims before searching the apartment. The co-conspirators did not find the stash of drugs or money they intended to steal, although they took one of the victim's wallets. They fled the apartment after they were tipped off that police were called to the scene. Mr. McLaughlin was later arrested and pled guilty to all counts in the indictment.

The Federal Sentencing Guidelines provided for a range of 147-to-162 months' imprisonment. Mr. McLaughlin and the Government agreed to a total sentence of 87 months, representing the mandatory minimum of 84 months for the § 924(c) offense and three months for the remaining offenses. The Court sentenced Mr. McLaughlin to the 87-month term, a significant downward departure from the guidelines' range, to be followed by five years of supervised release. At that time, the Court was aware that the mother of Mr. McLaughlin's two-year old son had been arrested and charged with the murder of the child's five-year old sister. At the time, Mr. McLaughlin's mother had assumed caregiving responsibility over her grandson.

Mr. McLaughlin is serving his sentence at USP Beaumont with an anticipated release date of March 9, 2023. He has served approximately 50 months and has earned nearly four months credit for good conduct even though while incarcerated, he has incurred six disciplinary sanctions, including two for fighting and another for assault without serious injury.

## II.    Mr. McLaughlin's Request for Compassionate Release and Medical Records

On September 10, 2020, Mr. McLaughlin requested compassionate release from the warden of the facility where he is confined. The warden denied this request roughly two weeks later. In October, Mr. McLaughlin filed his first *pro se* motion with this Court, requesting relief based on a recent positive COVID-19 test, his rehabilitative efforts, and because the mother of his son was now incarcerated on the murder charge. Doc. No. 229. A month later, he filed a second

2

*pro se* motion. Doc. No. 233. The second motion seeks relief based only on his fear of contracting COVID-19 while incarcerated.

Mr. McLaughlin's medical records for the past two years reveal that he is obese and has mild asthma. His asthma is currently controlled with medication provided by the Bureau of Prisons ("BOP") where he is confined. Mr. McLaughlin tested positive for COVID-19 roughly seven months ago. He has since recovered and is reportedly fully ambulatory and engages in all normal activities of daily living within the prison. Mr. McLaughlin does not reference either of these medical conditions in his motions.

### III.    BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions last March.

---

[1]    BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Feb. 11, 2021).

[2]    BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Feb. 11, 2021).

3

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the

---

[3]     This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Mr. McLaughlin currently lives at USP Beaumont. As of February 11, 2021, two inmates and three staff members are currently COVID-positive. Overall, at this facility, 124 inmates and 22 staff members were previously positive for COVID-19.[4] Beaumont isolates any inmate who tests positive while they are treated and recovering. And the BOP website continues to provide transparent information with the community about positive cases and recoveries.

LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

---

[4]     The data is current as of February 11, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

[5]     "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

---

[6]     The Government does not contest that Mr. McLaughlin has met the exhaustion requirement.

[7]     Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Because Mr. McLaughlin proceeds *pro se*, the Court will also consider the bases raised his first motion, although he appears to have abandoned all but his generalized fear of the virus in his second motion. Taken together, Mr. McLaughlin's two motions request immediate release given the risk of contracting the virus while incarcerated, his previous bout of COVID-19, his efforts at rehabilitation, and his family circumstances.

Mr. McLaughlin's generalized concern that he may contract the virus again is not an extraordinary and compelling reason to warrant release. Because COVID-19 poses a general threat to every non-immune individual, the mere existence of the disease does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see*

7

*also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").[8]

To be sure, Mr. McLaughlin did test previously positive for COVID-19. But he has made an apparent full recovery. A careful review of his medical records show that he received proper medical attention, including receiving daily medical assessments. Doc. No. 239 (under seal). He does not point to any long-term health consequences, let alone one that constitutes an extraordinary and compelling reason. He does not dispute or challenge the care and treatment he received from the medical staff at Beaumont after he tested positive.

As this Court has previously expressed, prior infection and recovery from COVID-19 without incident is not a basis for compassionate release. *United States v. Ortiz Cabrera*, No. CR 18-304-01, 2021 WL 411502, at *1 (E.D. Pa. Feb. 5, 2021) (denying compassionate release for defendant who tested positive for COVID-19, was asymptomatic, and recovered); *United States v. Wiltshire*, No. CR 11-310, 2020 WL 7263184, at *6 (E.D. Pa. Dec. 9, 2020) (same). This Court's finding that such a circumstance does not warrant release—even when the defendant has other documented medical conditions—is shared by other district courts. *United States v. Moore*, No. CR 14-315-06, 2020 WL 7264597, at *3 (E.D. Pa. Dec. 10, 2020) (release denied when defendant with hypertension, high cholesterol, GERD, and mild obesity recovered from asymptomatic bout

---

[8]     Mr. McLaughlin's second motion also appears to claim that incarceration during the COVID-19 pandemic violates the Eighth Amendment of the United States Constitution. The Third Circuit Court of Appeals recently considered and rejected a claim that detention during the COVID-19 pandemic was unconstitutional. Detention during a pandemic is unconstitutional only if the "conditions of confinement are meant to punish" rather than "an incident of some other legitimate governmental purpose." *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020). Because Mr. McLaughlin's motion does not show that the conditions are "intended to harm [him]," *id.* at 328, the Court rejects his constitutional challenge.

of COVID-19); *United States v. Norcross*, No. 8:05-CR-291-T-02JSS, 2020 WL 5076578, at *2 (M.D. Fla. Aug. 27, 2020) (denying motion for release where defendant had hypertension and recovered from COVID-19); *United States v. Peuse*, No. 17-CR-00598-LHK, 2020 WL 5076356 (N.D. Cal. Aug. 24, 2020) (collecting cases).

In the context of the COVID-19 pandemic, courts have limited compassionate release to situations when the defendant suffers from a serious medical condition that increases his risk of severe consequences from the virus. The Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[9]  The CDC also lists several conditions where there "might be an increased risk for severe illness," but insufficient data exists to say more. "Moderate to severe" asthma fall into this "might" category. Although this Court is not bound by the CDC's guidelines, it (along with many other district courts) treats CDC guidance as reliably informative. *See United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

Mr. McLaughlin does not establish that his asthma diagnosis meets the clinical definition of "moderate to severe."[10]  His medical records reveal that he is prescribed a one-step inhaler to be used "as needed" and a prophylactic steroid intended to prevent asthma attacks. He appears to use the inhaler once a week. The evidence of his last asthma attack was over a year ago.

---

[9]    *See People at Increased Risk*, Centers for Disease Control and Prevention (Jan. 4, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Feb. 11, 2021).

[10]    The United States Department of Health and Human Services describes asthma as "moderate persistent" when any of the following are true: symptoms occur daily; symptoms limit normal activity; symptoms at night occur once a week; and lung function tests are abnormal. Department of Health and Human Services, *Asthma Care Quick Reference:  Diagnosing and Managing Asthma* (Sept. 2012), available at https://www.nhlbi.nih.gov/sites/default/files/media/docs/12-5075.pdf (last visited Feb. 11, 2021).

9

Courts routinely deny motions for the extraordinary remedy of compassionate relief based on mild asthma. *See, e.g.*, *United States v. Vernon Gaskin*, No. CR 15-352, 2020 WL 7263185 (E.D. Pa. Dec. 9, 2020) (denying release to defendant without daily asthmatic symptoms who did not use his inhaler daily); *United States v. Slone*, No. CR 16-400, 2020 WL 3542196 (E.D. Pa. June 30, 2020) (defendant's mild asthma, without other medical risk factors, did not constitute "extraordinary and compelling" circumstances); *United States v. Towel*, No. CR 17-519-6, 2020 WL 2992528 (E.D. Pa. June 4, 2020) (denying release to defendant with mild, exercise-induced asthma, which was managed with limited use of inhaler); *U.S. v. Rodriguez*, No. 16-167, 2020 WL 1866040 (S.D.N.Y. Apr. 14, 2020) (experiencing "reportedly well controlled" asthma while incarcerated during COVID-19 is "not enough" to justify compassionate release). So, his asthma does not constitute a reason warranting release.

Although Mr. McLaughlin does not raise it himself, the Government notes that his body mass index is 34. The CDC identifies obesity—measured as a BMI of 30 or greater—as presenting an increased risk of severe illness from COVID-19. But a qualifying medical condition, as detailed in the above guidelines policy statement, is only one in which the inmate is "not expected to recover." And, in general, courts have been reluctant to grant compassionate release based solely on obesity. *See United States v. Williams*, No. 15-cr-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) ("[O]besity during the age of the COVID-19 pandemic does not necessarily mean, on its own, that extraordinary and compelling reasons justify the reduction of his sentence."); *United States v. Grasha*, No. 18-cr-325, 2020 WL 5747829, at *5 (W.D. Pa. Sept. 24, 2020) (finding defendant's obesity and BMI of 48, while presenting a serious risk, did "not arise to an extraordinary and compelling reason for release").

10



Apart from his medical conditions, in his first motion, Mr. McLaughlin contends that his family circumstances warrant release. Since Mr. McLaughlin was sentenced, the mother of his two-year old son was incarcerated for the murder of Mr. McLaughlin's five-year old daughter. However, the pending charges against the mother were known to all parties at the time of sentencing. Moreover, prior to Mr. McLaughlin's sentencing and continuing to the present, Mr. McLaughlin's mother, the child's grandmother, has been the primary caregiver for his son. Mr. McLaughlin now claims that his 53-year-old mother can no longer care for the child because she is "elderly." Doc. No. 229 at 4. He does not substantiate the claim that his mother has been incapacitated in any way with medical documentation or other evidence. Nevertheless, as a result, he now asserts that he is the "sole reasonable caregiver." *Id.* The Court is sympathetic to the family's situation and the loss of innocent life. But Mr. McLaughlin fails to explain why his mother can no longer provide adequate care for his son, as she has apparently done up until this point. And, Mr. McLaughlin admits that he has "substantial family support." Doc. No. 229 at 11. So, the caregiving situation does not provide an extraordinary and compelling reason for Mr. McLaughlin's compassionate release.[11]

Neither Mr. McLaughlin's medical conditions nor his family circumstances present an extraordinary and compelling reason for release. Even if the Court assumed his obesity was such a reason, the extraordinary relief he requests will be denied. Consideration of the § 3553(a) factors compel this result.

Mr. McLaughlin has failed to show that an early release comports with the statutory sentencing factors. He and his co-conspirators participated in a violent robbery at gunpoint,

---

[11]     *See* U.S.S.G. § 1B1.13 n.1(C) (defining family circumstances as compelling in the case of the "death or incapacitation of the caregiver of the defendant's minor child," or "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.").

11

offenses that he committed while already on probation for a felony drug crime. The Court is mindful of an emerging pattern of criminal activity, despite Mr. McLaughlin only being 26 years old.

In the past ten years, Mr. McLaughlin's criminal record includes multiple counts each of possession with intent to distribute controlled substances and making terroristic threats while brandishing a firearm and threatening to shoot. And, Mr. McLaughlin has repeatedly demonstrated his disregard for court orders while on supervision.

Although it is his burden to show that a reduction in sentence in proper, Mr. McLaughlin has failed to make any showing that an early release aligns with the statutory sentencing factors. Construing his motion liberally, he vaguely refers to his efforts at rehabilitation. This is insufficient. Congress has explicitly stated that "rehabilitation of the defendant alone" is insufficient for compassionate release. 28 U.S.C. § 994(t). Moreover, it is belied by Mr. McLaughlin's disciplinary record while incarcerated, which includes infractions for fighting, assaulting an inmate, and holding a cell door shut while two other inmates fought.

The gravity of Mr. McLaughlin's crimes and the danger posed to the community warrant the sentence imposed—a sentence which represents a significant downward departure from the range provided by the Federal Sentencing Guidelines. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration"). The Court does not find cause to disturb the sentence here.

## CONCLUSION

For the foregoing reasons, the Court denies both Mr. McLaughlin's first and second motions for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

13